USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/12/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X
                              :

                              :

IN RE INSYS THERAPEUTICS, INC.     :
SECURITIES LITIGATION

                              :

                              :

-------------------------------------------------------X

17 Civ. 1954 (PAC)

**OPINION & ORDER**

HONORABLE PAUL A. CROTTY, United States District Judge:

Lead Plaintiff Michael Robson claims in this securities fraud class action, on behalf of

himself and all others who purchased or otherwise acquired the securities of Insys Therapeutics,

Inc. ("Insys") between May 7, 2015 and March 15, 2017 (the "Class Period"), that Insys and

several of its high-ranking officers—Michael L. Babich, John N. Kapoor, Darryl S. Baker,

Santosh J. Vetticaden ("Individual Defendants")—made material misrepresentations about

profitability of Insys's drug, Subsys, thereby causing Insys's stock price to be artificially

inflated, in violation of Section 10(b) of the Securities Exchange Act of 1934 ("the Exchange

Act") and Rule 10b–5 promulgated thereunder, and Section 20(a) of the Exchange Act.[1]

Insys and Individual Defendants (collectively, "Defendants") move to dismiss the Second

Amended Complaint ("SAC"). ECF 31. For reasons set forth below, Insys, Babich, Baker, and

Kapoor's motion to dismiss is **DENIED**, and Vetticaden's motion is **GRANTED**.

**BACKGROUND**

Insys is a specialty pharmaceutical company that develops and commercializes pain

management medication. SAC ¶28. Its principal product, and virtually exclusive source of

revenue, is the prescription medication Subsys, a sublingual fentanyl spray designed to treat

---

[1] Initially, two separate class action complaints were filed: Case Nos. 17 Civ. 1954; and 17 Civ. 2225. They were
subsequently consolidated under the instant docket, 17 Civ. 1954 (PAC). *See* ECF 22.

breakthrough cancer pain in opioid tolerant patients, that is, gravely ill cancer patients already receiving around-the-clock opiod pain medication. *Id.* ¶13.

Initially, Subsys was successful. By November 2013, less than two years after its launch, Subsys accounted for nearly one-third of the market for Transmucosal Immediate Release Fentanyl ("TIRF") medication, and by the end of 2016, Subsys had 43% of the market. *Id.* ¶32. Subsys's financial success depended on insurance coverage by third-party payers and large-volume distribution by distributors (*see, e.g., id.* ¶¶35–37, 45–47), and Insys offered various promotions to encourage their continued cooperation. For example, Insys offered the third-party payers discounts and rebates for continued insurance coverage and reimbursement (*id.* ¶¶39–41); and Insys permitted distributors to return Subsys for a full refund "up to 12 months following its product expiration date" to reduce the risk associated with large-volume distribution (*id.* ¶¶45–47, 68).

The success of Subsys was limited. The Federal Drug Administration's approval of Subsys was limited to the treatment of breakthrough cancer pain in opioid-tolerant patients, and the reimbursement for Subsys was tightly regulated and limited to such "on-label" uses. *See id.* ¶¶13, 38, 39. Insys nonetheless promoted prescription of Subsys for off-label uses (*e.g.,* for acute neck or back pain) through a kickback scheme, and falsely claimed reimbursements for such off-label prescriptions as on-label uses. *Id.* ¶¶2, 38, 44, 48, 50. When the Government exposed and prosecuted the kickback scheme, third-party payers increasingly denied reimbursements for Subsys, resulting in pressure on Insys's net revenues and profits, even with steeper discounts and rebates. *Id.* ¶¶58–65, 69.

Insys initially attempted to conceal the declining revenues and income. *Id.* ¶1. Insys's own accounting policies and Generally Accepted Accounting Practices ("GAAP") required it to estimate the rebates and returns for Subsys, and treat the estimates as an increase to its sales

allowance (*i.e.*, revenue reduction) for the same period that the corresponding revenue was recognized. *Id.* ¶¶41, 68. Notwithstanding assurances of compliance with these policies, Insys systematically underestimated the rebates and returns to inflate the revenues and earnings (*see id.* ¶¶62, 71–73) and issued public statements to boast its financial health when, in fact, it was financially struggling (*see id.* ¶¶86–229).

Insys's financial condition was revealed on March 15, 2017, when its improper accounting practices were exposed. Insys announced its Audit Committee's investigation of its "processes related to estimation of, and increases to, certain sales allowances recorded during 2016, with a potential reduction of 2015 net revenue and pre-tax income not expected to exceed $5 million, as well as extended payment terms offered to certain customers during the third quarter of 2016." *Id.* ¶230. In response to the announcement, the price of Insys's common stock dropped from a closing share price of $10.55 on March 15, 2017 to $10.06 at close on March 16, 2017, a loss of 4.64%, on trading volume that was 37.4% higher than the prior day. *Id.* ¶232.[2]

On March 31, 2017, Insys announced its Audit Committee's conclusion that "the Company's previously issued interim unaudited condensed consolidated financial statements as of and for the quarters ended September 30, June 30, and March 31, 2016 and 2015, should no longer be relied upon, and determined that those financial statements will be restated due to the identification of certain errors." ECF 33-2 ("Form 8-K, March 2017")[3]. The announcement also stated that the "errors related to the Company's accounting for certain of its product sales allowances," acknowledging that Insys "had miscalculated its rebate obligations". *Id.* On the next trading day, Insys's stock price increased from $10.51 per share to $10.75 per share, or by approximately 2.3%.

---

[2] In contrast, on March 16, 2017, the NASDAQ US Smart Pharma Index was up 1.6%. *Id.*
[3] The Court takes judicial notice of public disclosure documents filed with the Securities and Exchange Commission ("SEC"). *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773–74 (2d Cir. 1991).

On April 7, 2017, Insys restated its financials, correcting the accounting errors for the first, second, and third quarters of 2015 and 2016. SAC ¶235. The restatement increased the product sales allowance (*see id.*), but for three of the six restated quarters, the restatement revised both net revenue and net income upwards. Also, in the aggregate of six restated quarters, the net revenue decreased only by $200,000, or about 0.05%, and the net income increased by $1 million, or about 2%. *Id.* ¶¶235, 236.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* When considering a motion to dismiss pursuant to the Federal Rule of Civil Procedure 12(b)(6), the Court "must accept as true all of the factual allegations contained in the complaint," and construe the complaint in the light most favorable to the plaintiff. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).

Allegations of securities fraud must meet the heightened pleading standards of the Federal Rule Civil Procedure 9(b) (*see ECA & Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) ("ECA")); and of the Private Securities Litigation Reform Act ("PSLRA"), which requires, with respect to each act or omission, that the complaint "state[s] with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" (15 U.S.C. § 78u-4(b)(2)).

## DISCUSSION

Plaintiffs claim that Defendants inflated the price of Insys's common stock with misleading financial statements in violation of the Exchange Act. When construed in light most favorable to Plaintiffs, the SAC has "state[d] a claim to relief that is plausible on its face" (*Iqbal*, 556 U.S. at 678) against Insys, Babich, Baker, and Kapoor, but *not* against Vetticaden. Accordingly, Insys, Babich, Baker, and Kapoor's motion to dismiss is denied, but Vetticaden's motion is granted.

## I. Claims under Section 10(b) against All Defendants

To bring a successful claim under Section 10(b) of the Exchange Act and Rule 10b-5, Plaintiffs must allege sufficient facts to establish that Defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re Puda Coal Sec. Inc., Litig.*, 30 F. Supp. 3d 261, 265–66 (S.D.N.Y. 2014). For reasons set forth below, Plaintiffs have adequately pleaded each of these elements against Insys, Babich, Baker, and Kapoor. [4]

### A. Actionable Misstatements

Statements that were "material" and "false at the time [they were] made" are actionable under Section 10 of the Exchange Act. *In re Lululemon Sec. Litig.*, 14 F. Supp. 3d 553, 571 (S.D.N.Y. 2014). Under this principle, Insys's statements about the following subject matter are actionable: (1) Insys's financial performance (SAC ¶¶237–254); (2) its compliance with accounting policies (*id.* ¶¶242–246); and (3) the adequacy of its internal controls (*id.* ¶¶255–265). These actionable statements are attributable to Babich, Baker, and Kapoor, as they personally endorsed these statements. These statements, however, are not attributable to

---

[4] Since Defendants do not dispute that the alleged misstatements were made in connection with the purchase or sale of securities and that they were relied upon, the Court does not address these elements.

Vetticaden because he did not personally make or endorse them.

### i. Falsity

#### 1. Financial Statements

It is undisputed that Insys's financial statements for the first, second, third quarters of 2015 and 2016 were false at the time they were released. As Insys admitted on March 31, 2017, these statements had "certain errors" when made. Form 8-K, March 2017. *See also* SAC ¶¶75, 76, 242–254.

#### 2. Assurance concerning Compliance with Accounting Policies

Insys's assurance—that it complied with its accounting policies and GAAP—was also false when made. Insys claimed that it "recognize[d] revenue from the sale of Subsys" "when (i) persuasive evidence of an arrangement exist[ed], (ii) delivery ha[d] occurred and title ha[d] passed, (iii) the price [was] fixed or determinable and (iv) collectability [was] reasonably assured." *Id.* ¶86. *See also id.* ¶¶106; 125; 146; 167; 191; 215. Insys further claimed that reasonable estimates of rebates and product returns were recognized as a reduction of revenue in the period the related revenue was recognized. *Id.* ¶¶87–89. *See also id.* ¶¶106–09; 125–28; 146–49; 167–70; 191–94; 215–18.

Insys's assurance was false. *First*, Insys admittedly issued financial statements with "certain errors", acknowledging that its financial statements and assurance were false. Form 8-K, March 2017. *Second*, Insys recognized revenues from Subsys upon product's shipment to distributors. That was contrary to Insys's assurance that revenues were recognized only when the collectability was reasonably assured. *Id.* ¶¶242, 244, 246. Under the distribution agreement, distributors could return Subsys even after Subsys's expiration date (*see id.* ¶68), and Insys had no reasonable way to estimate the rate of such returns (*id.* ¶72). Accordingly, Insys could not have reasonably assured the collectability of Subsys in the distribution channel, and

under its accounting policy, Insys should not have recognized revenues from it. Nonetheless, Insys did, rendering its assurance false.

*Third*, Insys did not reduce the revenue using reasonable estimates of rebates and product returns. Instead, Insys simply assumed that the rebates and future product returns would comprise a fixed percentage of revenues, contrary to its assurance that the revenues would be reduced by reasonable estimates of rebates and returns. *Id.* ¶248.

Accordingly, Plaintiffs have "demonstrated with specificity why" the assurance was false at the time it was made. *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004).

### 3. Assurance concerning Effectiveness of Internal Controls

Insys also made false assurance concerning effectiveness of its internal controls. Insys claimed that its "disclosure controls and procedures were effective" (SAC ¶96), when, as Insys later admitted, they were "not effective" (ECF 33-11 at Explanatory Note). Indeed, these controls and procedures could not even prevent accounting errors that were "not complicated." Mem. 14. Internal controls incapable of preventing simple errors cannot be deemed effective. Accordingly, Insys's assurance concerning effectiveness of its internal controls was false when made.

### ii. Materiality

"At the pleading stage, a plaintiff satisfies the materiality requirement ... by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *In re Cannavest Corp. Sec. Litig.*, 2018 WL 1633847, at *6 (S.D.N.Y. Mar. 31, 2018). The operative question is whether the alleged misstatements would have significantly altered the total mix of information available to a reasonable investor. *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988).

### 1. Financial Statements

The SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (1999) ("SAB No. 99"), "which provides relevant guidance regarding the proper assessment of materiality" of financial misstatements (*Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 717 (2d Cir. 2011)), notes that restatements of financial performance are presumptively immaterial unless the financial performance is revised downward by more than 5%. Defendants claim, under this rule of thumb, that the apparent errors in Insys's financial statements were immaterial. The downward revision of net revenue in each of the restated quarters was less than 5%; although the revision to net income did exceed 5% in two of the six quarters, these deficits were mitigated by corresponding upward revisions in three of the six quarters; the aggregate net revenue decreased only by 0.05%; and the aggregate net income actually *increased* by 2%. *See* Mem. 14–15. Defendants' contention focuses exclusively on the magnitude of errors.

Defendants, however, ignore that to properly assess the materiality of errors in financial statements, "a court must consider both quantitative and qualitative factors … and that consideration should be undertaken in an integrative manner." *Litwin*, 634 F.3d at 717 (internal citations and quotations removed). "Quantifying, in percentage terms, the magnitude of a misstatement ... cannot appropriately be used as a substitute for a full analysis of all relevant considerations." SAB No. 99, 64 Fed. Reg. at 45,151.

When both quantitative and quantitative factors are considered, a reasonable investor could have found the errors to be material. *First*, the erroneous statements pertain to Insys's dominant product, Subsys, which accounts for almost the entirety of its revenue (*see* SAC ¶¶28–34), which is probative of materiality (SAB No. 99, 64 Fed. Reg. at 45150 (the qualitative factors include "whether the misstatement concerns a segment or other portion of the registrant's business that has been identified as playing a significant role in the registrant's operations or

8

profitability")).

*Second*, the erroneous statements were allegedly made to conceal a significant decline in Subsys revenue (*see* SAC ¶3), which is also probative of materiality (SAB No. 99, 64 Fed. Reg. at 45150–01 (the qualitative factors include "[w]hether the misstatement masks a change in earnings or other trends"; "[w]hether the misstatement changes a loss into income or vice versa"; and "[w]hether the misstatement affects the registrant's compliance with regulatory requirements.")).

*Third*, when Insys announced that its Audit Committee had been investigating its accounting practices, investors reacted with heavy trading volume that was 37.4% higher than the prior day (SAC ¶232), which is empirical evidence of materiality.

*Fourth*, "the fact that [Defendants] restated their financial information … reinforces the conclusion that defendants had made … material misstatements." *In re Veeco Instruments, inc., Sec. Litig.*, 235 F.R.D. 220, 234 (S.D.N.Y. 2006). "[A]n overstatement of [] earnings was not rendered immaterial simply because profits for [the Class Period] as a whole were not affected by the misrepresentation." *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 165 (2d Cir. 2000).

"[A] complaint may not properly be dismissed…on the ground that the alleged misstatements or omissions are not material," unless the alleged misstatements were "so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* at 162. For reasons stated above, the erroneous statements here were not "so obviously unimportant". *Id.* Accordingly, the Court cannot dismiss this claim on the ground that the erroneous statements were immaterial.

> **2.** <u>Assurance concerning Compliance with Accounting Policies and</u>
> <u>Effectiveness of Internal Controls</u>

Defendants do not challenge the materiality of the false assurance. *See* Mem. 10–13.

Rightly so. A financial statement is a strong indicator of a company's performance, and a reasonable investor should be able to rely heavily on it in making an investment decision. When assurance that a company complies with its accounting policies, or that a company has effective internal controls, turns out to be false, that would be "viewed by the reasonable investor as having significantly altered the total mix of information made available". *Basic*, 485 U.S. at 231–32. Accordingly, the alleged misstatements concerning compliance with accounting policies and effectiveness of internal controls were material.

### iii. Individual Defendants

The alleged misstatements made by Insys are attributable to Baker, Babich, and Kapoor. Baker and Babich signed and certified the alleged misstatements in Form 10-Q for periods that ended on March 31, 2015 and June 30, 2015 (SAC ¶¶85, 99, 105); and Baker and Kapoor signed and certified the alleged misstatements in (1) Form 10-Q for periods that ended on September 30, 2015, March 31, 2016, June 30, 2016, and September 30, 2016, and (2) in the 2015 Annual Report (*id.* ¶¶ 124, 145, 166, 190). Accordingly, the alleged misstatements are attributable to Baker, Babich, and Kapoor.

But none of the alleged misstatements are attributable to Vetticaden. Vetticaden did not personally sign or certify any of the alleged misstatements. Vetticaden's remarks during earnings calls had no bearing on the financial performance or accounting policies, supposedly because he was merely a Chief Medical Officer when the earnings calls were held. *See id.* ¶¶ 21, 164, 209, 211. Besides, Vetticaden was the one that oversaw the investigation into Insys's misleading accounting practices. *See id.* ¶79. Accordingly, even in light most favorable to Plaintiffs, the alleged misstatements are not attributable to Vetticaden. The motion to dismiss the Section 10(b) claim against Vetticaden is granted.

**B. Scienter**

Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind"—that is, scienter. 15 U.S.C. § 78u-4(b)(2)(A). When deciding a motion pursuant to Rule 12(b)(6), the inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (emphasis in original). A strong inference of scienter can be demonstrated "by alleging facts to show ... that defendants had the motive and opportunity to commit fraud". *ECA*, 553 F.3d at 198. For an inference of scienter to be strong, "a reasonable person [must] deem [it] cogent and at least as compelling as any opposing inference." *Tellabs*, 551 U.S. at 324.

The alleged facts are sufficient to support an inference that Babich, Baker, and Kapoor had both the motive and opportunity to make the alleged misstatements. Babich, Baker, and Kapoor clearly had such an opportunity: Babich, Baker, and Kapoor were high ranking officers of Insys with full control over what was to be disclosed and what was not. Babich, Baker, and Kapoor also had the requisite motive. Subsys's revenue had grown consistently until 2015, when it started to languish, as Insys was being scrutinized for its involvement in a kickback scheme, for which Kapoor and Babich were personally indicted. SAC ¶¶14, 20. In an effort to maintain the appearance of continued success and cover up the economic impact of an on-going criminal investigation, Babich, Baker, and Kapoor had the motive to misstate the financials of Subsys, in violation of its accounting policies and internal controls. These allegations support more than mere generic "[m]otives that are common to most corporate officers" (*ECA*, 553 F.3d at 198) and this inference is "at least as compelling as any opposing inference" (*Tellabs*, 551 U.S. at 324).

But even if the allegations of motive were weak, they can still support a strong inference of scienter when they are accompanied by "extensive allegations of circumstantial evidence of

11

recklessness and misconduct that strongly buttress the motive alleged." *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 275 (S.D.N.Y. 2014). The SAC is replete with such allegations. *First*, Insys and its officers failed "to maintain sufficient internal controls to avoid fraud[, which is] sufficiently indicative of scienter." *Veeco Instruments*, 235 F.R.D. at 232. *See also Hall*, 580 F. Supp. 2d at 23 ("[T]he Company admitted that it had material weaknesses in its internal controls – weaknesses [were] probative of scienter."). *Second*, Babich, Baker, and Kapoor were aware of the rate of Subsys prescriptions and the actual return history (*see* SAC ¶¶274–76, 290), yet they failed to properly account for them in the financial statements. *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (a strong inference of scienter may arise when defendants "knew facts or had access to information suggesting that their public statements were not accurate"). *Third,* "the management in the finance and accounting group did not display adequate tone at the top with respect to judgment and rigor required to resolve the accounting for the rebates component of [Insys's] product sales allowances." ECF 33-11. These allegations buttress the determination that Babich, Baker, and Kapoor had both the motive and opportunity to make the alleged misrepresentation.

Baker's, Babich's, and Kapoor's scienter is attributable to Insys. *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 408 (S.D.N.Y. 2016) ("[T]he most straightforward way to raise such an inference [of requisite scienter] for a corporate defendant will be to plead it for an individual defendant."). Accordingly, Plaintiffs have pleaded sufficient facts to establish that Insys, Babich, Baker, and Kapoor had the requisite scienter.

## C. Loss Causation

A plaintiff claiming securities fraud under the Exchange Act must "adequately allege ... the traditional elements of causation and loss." *Dura Pharm., Inc. v. Broudo*, 544 U.S 336, 346 (2005). Loss causation can be established by alleging "the existence of cause-in-fact on the ground that the market reacted negatively to a corrective disclosure of the fraud." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511, 513 (2d Cir. 2010). Loss causation "need not be pleaded with particularity"; this district has historically applied the notice pleading standard for loss causation. *In re Citigroup Inc. Sec. Litig.*, 753 F. Supp. 2d 206, 234 (S.D.N.Y. 2010).

Defendants contend that Plaintiffs have failed to plead the requisite corrective disclosure because the March 15, 2017 press release, which Plaintiffs contend was the corrective disclosure, did not specify the actual error in the alleged misstatements. The Court disagrees. A corrective disclosure need not be a full recount of the alleged fraud. It only needs to reveal the "alleged misstatement's falsity." *In re Lululemon*, 14 F. Supp. 3d at 575.

The "alleged misstatement's falsity" was sufficiently revealed in the March 2017 press release. The March 15, 2017 press release stated that Insys "ha[d] been conducting an independent review of [Insys's] processes related to estimation of, and increases to, certain sales allowances recorded during 2016," and that the independent review might reduce the "2015 net revenue and pre-tax income". ECF 33-29. Upon announcement, the "price of Insys common stock declined from a closing price of $10.55 on March 15, 2017 to a closing price of $10.05 on March 16, 2017, a loss of 4.64%. SAC ¶314.

Although "[t]he announcement of ... an internal investigation is itself insufficient to plead loss causation", it can be sufficient when the "investigation [is linked] to the actual fraudulent conduct alleged in the complaint." *Janbay v. Canadian Solar, Inc.*, 2012 WL 1080306, at *15 (S.D.N.Y. 2012). That is squarely the case here. The March 15, 2017 press

release clearly states that the independent review was "related to estimation of, and increases to, certain sales allowances recorded during 2016" (ECF 33-29), which is precisely the "actual fraudulent conduct alleged in the complaint" (*Janbay*, 2012 WL 1080306, at *15). Moreover, the press release suggested that the independent review might reduce the net revenue and pre-tax income, which clearly revealed the falsity of the financial statements and Insys's assurance. That is sufficient to establish the loss causation. That Insys's stock price rose after the actual restatement has no bearing on whether the March 15, 2017 press release was a corrective disclosure.

For reasons stated above, Plaintiffs have alleged sufficient facts to plausibly state a claim under Section 10(b) of the Exchange Act against Insys, Baker, Babich, and Kapoor. The motion to dismiss the Section 10(b) claim against Insys, Baker, Babich, and Kapoor is denied.

## II.  Claims under Section 20(a) against Individual Defendants

An officer of a company may be held accountable for the company's misrepresentations under Section 20(a) of the Exchange Act. To plead a claim under Section 20(a), a plaintiff must allege that: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation. *In re Alstom SA,* 406 F.Supp.2d 433, 486 (S.D.N.Y. 2005).

Defendants contend that the claim under Section 20(a) fails because Plaintiffs have not pleaded any primary violation by Insys. *See* Mem. 25. As indicated previously, the Court rejects this contention. The Section 20(a) claim against Vetticaden is dismissed: Plaintiffs have not pleaded that Vetticaden was a culpable participant in the primary violation. Vetticaden did not sign or certify any of the alleged misstatements. *See supra* at 10–11. To the contrary, when Vetticaden was the Interim Chief Executive Officer, Insys actually took steps to correct the alleged misstatements made by his predecessors. The SAC is devoid of any allegation that

Vetticaden took part in the primary violation. Accordingly, the motion to dismiss the Section 20(a) claim against Vetticaden is granted; and the motion to dismiss the Section 20(a) claim is otherwise denied.

## CONCLUSION

For the foregoing reasons, the motion to dismiss the SAC against Insys, Babich, Kapoor, and Baker is **DENIED**, but the motion to dismiss the SAC against Vetticaden is **GRANTED**. The Clerk of the Court is directed to close the pending motions at ECF 31.

Dated: New York, New York
      June 12, 2018

SO ORDERED

_____
PAUL A. CROTTY
United States District Judge